**SO ORDERED.**

**SIGNED this 31 day of May, 2017.**

_Stephani W. Humrickhouse_
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

___

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# NEW BERN DIVISION

IN RE:

| | |
|---|---|
| DONALD E. TAYLOR, ANNIE T. TAYLOR | CASE NO. 15-02730-5-SWH  CHAPTER 11 |
| DEBTORS. | |
| SOUND RIVERS, INC. and WATERKEEPERS ALLIANCE, INC. | ADVERSARY PROCEEDING  15-00099-5-SWH |
| Plaintiffs | |
| v. | |
| DONALD E. TAYLOR, ANNIE T. TAYLOR, | |
| Defendants. | |

## SUPPLEMENTAL OPINION ON ORDER REGARDING
## CROSS MOTIONS FOR SUMMARY JUDGMENT

This matter came before the court on cross-motions for summary judgment. A hearing was held in Raleigh, North Carolina on September 29, 2016. The court entered its Order Regarding Cross Motions for Summary Judgment on March 31, 2017. This supplemental opinion is intended

1

to provide the parties with a more complete explanation of the court's determination that summary judgment in favor of the plaintiffs is appropriate on the very limited basis that plaintiffs' claims for declaratory and injunctive relief regarding allegations of violations of the Clean Water Act (CWA), 33 U.S.C. §§ 1311, 1342, and the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972 are not "debts" as defined by the Bankruptcy Code.[1]

## BACKGROUND

The defendants in this matter, Donald and Annie Taylor, own and operate a swine farm in Jones County, North Carolina. The farm sits along a creek in Jones County known as Long Branch, a tributary of the Trent River, which by extension flows into the Neuse River. Plaintiffs are Sound Rivers, Inc. f/k/a Neuse Riverkeeper Foundation (Sound Rivers), a North Carolina not-for-profit organization aiming to preserve waterways within the State of North Carolina, and Waterkeeper Alliance, Inc. (Waterkeeper), a national non-profit organization representing the interests of watershed groups like Sound Rivers.

In July 2012, plaintiffs filed a civil action in the United States District Court for the Eastern District of North Carolina, *North Carolina Environmental Justice Network, Neuse Riverkeeper Foundation, Inc., and Waterkeeper Alliance, Inc. vs. Mr. Donald Taylor and Ms. Annie Taylor, individually and d/b/a Taylor Finishing, McLawhorn Livestock Farm, Inc., Mr. Justin T. McLawhorn and Mr. Aaron McLawhorn*, Case Number: 4:12-cv-00154-D (the Lawsuit), alleging swine waste or effluent from defendants' farming operations is improperly handled allowing it to discharge into Long Branch Creek in violation of the CWA and the RCRA. The Lawsuit is a "citizen suit," a

---

[1] The court notes that the Lawsuit (as later defined) contains additional causes of action which were not the subject of plaintiff's Adversary Proceeding (as it is later defined).

statutorily created private right of action under which private citizens are permitted to seek enforcement of federal environmental laws. There are a total of eleven claims for relief plead in the Lawsuit. Eight of the eleven claims seek injunctive relief.

On May 14, 2015, defendants filed a petition under chapter 11 of the Bankruptcy Code and the Lawsuit was stayed as to defendants by virtue of the automatic stay provisions of 11 U.S.C. § 362. On September 15, 2015, plaintiffs filed a complaint for declaratory relief initiating this adversary proceeding (the Adversary Proceeding). The Adversary Proceeding complaint does not ask nor require this court to decide whether defendants violated the CWA and/or RCRA as alleged in the Lawsuit. Rather, the issue presented is whether the relief requested in the eight injunctive claims are "debts" defined by 11 U.S.C. § 101(12).

On October 7, 2015, defendants filed their answer to the Adversary Proceeding complaint and filed a motion for summary judgment. In their third defense, which disputes the plaintiffs' standing, defendants assert plaintiffs are unable to identify an injury in fact which would be redressable by this court, an essential element of any request for declaratory relief. Plaintiffs filed a competing motion for summary judgment on August 25, 2016. Defendants filed their response to the plaintiffs' motion for summary judgment on September 2, 2016. At the outset of defendants' response to plaintiffs' motion for summary judgment defendants argue that because plaintiffs have not yet received any relief in the Lawsuit, the effect of asking this court to determine whether injunctive relief is a debt is a prohibited advisory opinion.

The court has wrangled with this matter from every conceivable angle. After extensive review of the briefs and the arguments of the parties, the court notes that the relief requested by the plaintiffs has many of the trappings of an advisory opinion and, quite frankly, an advisory opinion

3

determination would be an "easy out" for the court. But, alas, taking the easy way out in this case would not benefit either party or the bankruptcy estate.

Federal courts may not "give opinion[s] advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013)(internal citations omitted). It is currently unknown whether defendants will ultimately be liable to plaintiffs under any of the various theories asserted in the Lawsuit. Therefore, issuing a declaratory judgment in fact may be premature. However, the court is acutely aware that understanding whether a debt, and by extension a claim, exists and whether and how it can be treated is central to an effective reorganization which has been long sought in this case. The court is sensitive to the not insubstantial financial burden the Lawsuit and prolonged uncertainty of reorganization has placed on the debtors. Thus, despite an unknown outcome in the Lawsuit, this court will exercise its discretion and opt to find that its determination on whether injunctive relief is a debt does not give rise to a prohibited advisory opinion, and is inclined to take a more flexible and holistic view of this declaratory judgment Adversary Proceeding and its relation to the underlying bankruptcy. A declaratory judgment serves the useful purpose of giving certainty to a bankruptcy case which is otherwise at an impasse without an answer on the issue of what constitutes a "debt." A declaratory judgment affords the debtors, and all creditors more certainty about the debtors' ability to effectively reorganize. Moreover, policy favors declaratory judgments "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the preceding." *Aetna Casualty & Surety Co. v. Quarles*, 92 F. 2d 321, 325 (4th Cir. 1937). The court has, therefore, proceeded to a determination of this Adversary Proceeding and as will be explained more fully below, that the injunctive relief requested in the Lawsuit is not

a "debt" as defined by 11 U.S.C. § 101(12).

## DISCUSSION

**Standing In the Context of Environmental Litigation**

As a threshold matter, defendants challenge subject matter jurisdiction based upon a lack of constitutional standing. Article III of the United States Constitution limits jurisdiction of federal courts to actual "cases" or "controversies." U.S. Const. Art III, § 2, cl. 1. Defendants assert plaintiffs bear the burden of proving standing in both the Adversary Proceeding and the Lawsuit; and, as such, must establish: (1) an injury in fact; which is, (2) concrete and particularized; and (3) is actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). Plaintiffs disagree with the concept of "derivative standing," urging the court instead to focus its standing inquiry on the definition provisions of the Bankruptcy Code for who may be a proper claimant. Unfortunately, neither party has fully identified the proper standard for determining standing given the matter before the court is a declaratory action.

This court cannot determine standing in the Lawsuit, or derive standing therefrom, because the Lawsuit has not been referred to and, therefore, is not before this court. However, this court must have subject matter jurisdiction to issue a declaratory judgment and subject matter jurisdiction requires an "actual controversy." 28 U.S.C. § 2201(a). An actual controversy is "identical to the meaning of 'case or controversy' for the purposes of Article III." *Lawson v. Callahan*, 111 F.3d 403, 405 (5th Cir 1997). Therefore, there must be "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Bank of N.Y. v. Adelphia Communs. Corp.* (In re Adelphia Communs. Corp.), 307 B.R. 432, *437 (Bankr. S.D.N.Y. 2004) (citing, *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312

U.S. 270, 273, 85 L. Ed. 826, 61 S. Ct. 510 (1941)). The controversy surrounding whether the plaintiffs have a claim in the bankruptcy case is substantial and warrants immediate resolution. Without a resolution, the defendants cannot begin the process of reorganization and achieve their fresh start, and valid creditors are kept at bay without any indication of when they can expect repayment. Therefore, the court finds it has subject matter jurisdiction over this Adversary Proceeding; but, the standing analysis does not end at subject matter jurisdiction.

When an association is the named plaintiff as a representative of its individual members, the association has standing to sue if: (1) at least one member would have individual standing; (2) the issues presented in the litigation are germane to the association's purpose; and (3) neither the claim asserted nor relief requested requires participation of the associations individual members. *See Piney Run Pres. Ass'n v. County Comm'rs*, 268 F.3d 255, 262 (4th Cir 2001); see also *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 145 L. Ed. 2d 610, 120 S. Ct. 693 (2000). Plaintiffs identify six individual members of either Waterkeeper or Sound River for purposes of satisfying the association standing analysis: Rick Dove, Joanne Somerday, John Klecker, John "Jake" Jacobson, Dave McCracken, and Jim Starr. Defendants argue that none of the six named individuals are able to establish individual standing, thereby challenging only the first prong of the test for association standing. To overcome this challenge, plaintiffs must show at least one of the named individual members suffered (1) an injury in fact; which is, (2) traceable to the defendants and (3) can be redressed. *See*, *Am. Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 517 (4th Cir. 2003). Again, this court has cogitated on this issue at great length. It appears to the court standing of the six named individuals is extremely tenuous, but, hanging by a thread, exists.

When reviewing standing in the environmental context, "the question is whether the

6

[individual] plaintiff has suffered an injury, as opposed to whether the environment has actually been harmed." *Piney Run*, 268 F.3d 255, 263 (4th Cir 2001). "[A] plaintiff need only show that he used the affected area, and that he is an individual for whom the aesthetic and recreational values of the area are lessened by the defendant's activity." *Piney Run*, 268 F.3d at 263 (citing *Sierra Club v. Morton*, 405 U.S. 727, 735, 31 L. Ed. 2d 636, 92 S. Ct. 1361 (1972) (internal citations omitted)). The "affected area" does not include an area "roughly in the vicinity." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 397 (4th Cir 2011). Because this matter is at the summary judgment stage, plaintiffs are not entitled to "rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (citing, *Lujan*, 504 U.S. at 561); Fed. R. Civ. P. 56. All of the individuals named by the plaintiffs submitted affidavits in this matter, which taken as true, evidence use and enjoyment of the Trent and Neuse Rivers. However, the waterway on which this action centers is Long Branch Creek.

      Plaintiffs cite *Gaston* for the proposition that standing for individual plaintiffs may be established from use of tributaries. While *Gaston* is an instructive case on the issue of standing, this court does not read *Gaston* so broadly as to always find a tributary falls within the affected area verses nearly being in the vicinity. The *Gaston* court was concerned with whether the named plaintiffs, Friends of the Earth, Inc. and Citizens Local Environmental Action Network, Inc., maintained standing to prosecute a citizen's suit alleging violations under the Clean Water Act where the individual upon which standing had initially been established died. Looking to other members of the organizations, the district court determined the plaintiffs continued to have standing through another member, Jones. Defendant appealed arguing the district court erred when it upheld standing.

7

After reviewing the findings made by the district court, the Fourth Circuit Court of Appeals affirmed that Jones met the requisites for standing. *Gaston*, 629 F.3d 387,403 (4th Cir. 2011).

The defendant in *Gaston* owned a metal smelting facility, which discharged pollutants into Boggy Branch. The district court found pollutants ran into Boggy Branch, and from Boggy Branch went into Bull Swamp Creek, which connected to the North Fork of the Edisto River. Although the river was 16.5 miles from the defendant's facility, evidence existed that the pollutants from Boggy Branch were still present in the water at the confluence between the creek and river. Because Jones lead canoe and kayak trips through the confluence of Bull Swamp Creek and the Edisto River for numerous years, but had reduced the number of trips over concern of pollution from the smelting facility, the plaintiff's standing was upheld on appeal through Jones based upon the uncontested factual findings showing a direct connection to the water within the affected area.

The difference between *Gaston* and this present declaratory judgment action is there is insufficient evidence from which to find that the alleged discharges into Long Branch Creek impact the Trent and Neuse Rivers. The plaintiffs assert effluent is flowing into Long Branch and out into the Trent and Neuse Rivers, but all of the named individuals acknowledge there are multiple hog farms along the Trent and Neuse Rivers, any one of which could be causing or contributing to pollution levels. All of the named individuals also agree more continuous testing of the water quality from the tributaries nearest defendants' farm would be necessary to determine whether there is any impact on the Trent and Neuse Rivers. Additionally, Dr. Smolen, one of plaintiffs' expert witnesses, stated in his written opinion that while he believes defendants' facility discharges pollutants into Long Branch Creek, he never examined the water entering the Trent River from Long Branch Creek. Like Dr. Smolen, another expert witness, Dr. Michael Mallin, is of the opinion effluent pollution is

8

present in Long Branch Creek and will be transported downstream. However, there is no support for the proposition that any pollution has actually been transported. The natural order of water is that it flows downstream, but without more concrete evidence this court is not convinced defendants' farm is committing waste that stretches all the way to the Trent and Neuse Rivers. Therefore, unlike *Gaston*, this court cannot find pollutants attributable to defendants' farm have impacted the Trent and Neuse Rivers. The rivers may be in the rough vicinity of the affected area, but there has been an insufficient showing that the rivers are themselves affected.

Although there is insufficient evidence that pollutants from a tributary are affecting nearby rivers, there is evidence to suggest effluent may impact Long Branch Creek. Doctor Mallin and Doctor Smolen, after taking multiple samples near defendants' farming facilities are of the opinion effluent from defendants' farm may have discharged into Long Branch Creek. It is a *very* close call, but of the six named individuals, only one, John Jacobson, testified by affidavit to a connection with tributary waters in such a way that this court can find he would have individual standing as someone whose use and enjoyment of the affected area is lessened.

All of the named individuals reside in New Bern, North Carolina. Many of the named individuals are waterfront homeowners who use the Trent and Neuse Rivers for recreational enjoyment. As this court already determined, concern about the enjoyment of property or waterways in a rough vicinity to actual or threatened harm is too questionable a connection to withstand a challenge to standing. However, Mr. Jacobson is an avid kayaker on the rivers and tributaries. Mr. Jacobson asserts he no longer paddles the waterways from Trenton, North Carolina to Pollocksville, North Carolina, which is where defendants' farm is located, because odors from swine waste are bothersome to his enjoyment. In another context, this may be too flimsy an allegation to establish

standing; but, guidance from the Fourth Circuit informs that "[i]n the environmental litigation context, the standing requirements are not onerous. Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Am. Canoe Ass'n v. Murphy Farms*, Inc., 326 F.3d 505 at 517 (internal citations omitted). Because Mr. Jacobson has foregone kayaking in the tributary waters specifically in or around defendants farm, the court finds Mr. Jacobson suffered an injury in fact which is traceable to the affected area identified by plaintiffs' expert witnesses. Namely, tributary waters including Long Branch Creek. Therefore, Mr. Jacobson's concerns about tributary waters based upon the odor of effluent and his decision to abstain from kayaking in such areas are not only reasonable but support plaintiffs' standing in this action. *See*, *Id.* at 520.

### When Injunctive Relief is a Debt under § 101(12)

Because it has been determined that plaintiffs have standing to seek a declaratory judgment, the court now turns to whether the relief requested by plaintiffs in certain, selective counts in the Lawsuit is a "debt." Section 101(12) of the Bankruptcy Code defines "debt" as liability on a claim. The definition of "claim" includes a "right to an equitable remedy for breach of performance if such breach gives rise to a right of payment." 11 U.S.C. § 101(5)(B). Accordingly, in certain instances, equitable, injunctive relief can be a claim if it gives rise to a right of payment. Determining when equitable, injunctive relief becomes a claim, i.e. when it contains a right of payment, is important because only claims can be discharged in bankruptcy. *See*, *Stone St. Capital, Inc. v. Granati (In re Granati)*, 270 B.R. 575, 585 (Bankr. E.D. Va. 2001) ("[A] right to an equitable remedy, if it constitutes a 'claim,' is subject to discharge in bankruptcy just like any other claim unless it falls

within one of the specific statutory exceptions to discharge."). This appears to be a case of first impression in this district. However, courts in other districts looking at this issue have held that when an aggrieved party has the choice between an equitable remedy and monetary damages, there is a right of payment that must be treated as a claim in bankruptcy. *See, United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1008 (2nd Cir. 1991) ("An injunction that does no more than impose an obligation entirely as an alternative to a payment right is dischargeable."); *see also Am Int'l v. Datacard Corp.,* 106 F.3d 1342 (7th Cir. 1997) ("Whether a cleanup order can be discharged in bankruptcy depends on whether the order can be converted into a monetary obligation. Only orders which can be turned into a 'right to payment' are considered dischargable "claims" for bankruptcy purposes."); *United States v. Apex Oil Co.*, 579 F.3d 734, 736 ( 7th Cir 2009) ("[I]f the holder of an equitable claim can, in the event the equitable remedy turns out to be unobtainable, obtain a money judgment instead, the claim is discharageable."), cert. denied, No. 09-1023, 131 S. Ct. 67, 178 L. Ed. 2d 23, 2010 U.S. LEXIS 6286, 2010 WL 752322 (S. Ct. October 4, 2010). Said another way, if the creditor cannot accept money in lieu of an equitable remedy, the equitable remedy is not a claim. *Mark IV Indus. v. N.M. Envtl. Dep't (In re Mark IV Indus.)*, 438 B.R. 460, 465 (Bankr. S.D.N.Y. 2010).

There are three predominant cases, *Kovacs* and *Chateaugay I* and *Chateaugay II* which deal with whether equitable remedies related to environmental clean-up orders are claims in bankruptcy. In *Ohio v. Kovacs*, 469 U.S. 274, 105 S. Ct. 705, 83 L. Ed. 2d 649 (1985), the State of Ohio obtained an injunction under state law requiring the defendants to remove waste. After defendant failed to comply with the injunction, a receiver was sought and appointed to implement the clean-up. During the course of the receivership, one of the defendants, Kovacs, filed bankruptcy. An adversary

11

proceeding was filed by the State of Ohio to determine whether the debtor's obligation to clean-up the site was dischargable. The Supreme Court affirmed the lower courts' determination that because the receiver divested Kovacs of any control over the site, and seized his non-exempt assets to perform the clean-up, Kovacs was unable to perform the duties imposed by the injunction and the receiver's only remedy was payment. *Id.*, 469 U.S. 274 at 282-83. Although the injunction in *Kovacs* was deemed to constitute a right to payment, which allowed the injunction to be treated as a dischargable claim in the debtor's bankruptcy, the Supreme Court was careful to note an individual may not "maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions," suggesting that but for the intervention of the receiver and his divestiture of the debtor's assets the outcome may have been different. *See, Chateaugay*, 944 F.2d at 1008 ("What seems to have been decisive was the fact that Ohio obtained the appointment of a receiver, precluded Kovacs from taking any steps to comply with the injunction, and was seeking from Kovacs only the payment of money.").

After *Kovacs*, the district court for the Southern District of New York looked at the extent to which a claim for injunctive relief, and remedial, cleanup costs were dischargable in bankruptcy when the debtor was still in possession of the affected property. *United States v. LTV Steel Co., Inc. (In re Chateaugay)*, 112 B.R. 513 (S.D.N.Y. 1990) (often referred to as *Chateaugay I*). The defendant in *Chateaugay I*, LTV, was a large company with many subsidiaries. The industries in which LTV and its subsidiaries operated generated substantial amounts of hazardous industrial waste. After LTV filed to reorganize under chapter 11, proofs of claim were filed by the federal government and State of New York for amounts owed by LTV for alleged violations of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and RCRA. The district court

started its analysis of whether a claim was dischargable by focusing on when the claim arose. For purposes of bankruptcy, timing is crucial and absent a pre-petition release of a pollutant, liability for environmental clean up is not dischargable. *Chateaugay I* , 112 B.R. 513, 521 (S.D.N.Y. 1990). However, "[s]o long as there is a pre-petition triggering event, i.e., the release or threatened release of hazardous waste, the claim is dischargeable, regardless of when the claim for relief may be in all respects right for adjudication." *Id.* at 522. After determining the alleged violations were pre-petition, the district court brought the discussion back to whether an injunction for the pre-petition violation was a claim. Specifically, the court asked the question: when does injunctive relief give rise to a right to payment? The answer, very simply, is when a governmental entity undertakes cleanup of a contaminated site and requires repayment for the costs associated with the cleanup. While agreeing with this general principle, the EPA, in *Chateaugay I*, argued for a distinction in those instances where the government has discretion to forego recoupment of clean up costs. The district court rejected the argument made by the EPA that because the government had the option to conduct clean-up and seek repayment under an injunction, but might not exercise its option, the right to payment was nullified. "Even an optional *right* to payment is nonetheless a right to payment and the fact that EPA may not choose to exercise that option in no way negates the existence of that right." *Id.* Therefore, an injunction that includes an optional right to payment is a dischargable claim in bankruptcy if the triggering event occurred pre-petition. Notwithstanding the district court's analysis of when an injunction includes a right of payment, the fact a debtor may be required to spend money to comply with an injunction does not convert an injunction into a right of payment. *Id.* at 524; *See United States v. Apex Oil Co.*, 579 F.3d 734, 738 (7 Cir. 2009) ("Almost every equitable decree imposes a cost on the defendant, whether the decree requires him to do something, as in this case, or,

as is more common, to refrain from doing something . . . . If any order requiring the debtor to expend money creates a dischargeable claim, it is unlikely that the state could effectively enforce its laws: virtually all enforcement actions impose some cost on the violator.")(internal citations omitted). The Second Circuit, affirming *Chateaugay I*, restated this standard as follows:

> "[a]n injunction that does no more than impose an obligation entirely as an alternative to a payment right is dischargable . . . on the other hand, if the order, no matter how phrased, requires . . . action that ends or ameliorates current pollution, such order is not a claim . . . . Thus, a cleanup order that accomplishes the dual objective of removing accumulated wastes and stopping or ameliorating ongoing pollution emanating from such wastes is not a dischargeable claim."

*United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1010 (2nd Cir. 1991) (commonly referred to as *Chateaugay III)*.

From *Kovacs* and *Chateaugay I and III*, courts have distilled three factors to consider when determining whether the breach of environmental injunctions and clean-up directives give rise to a claim: (1) is the debtor capable of executing the equitable decree, or can he only comply by paying someone else; (2) is the pollution ongoing; and (3) if the pollution is not ongoing, or if the clean-up order imposes discrete obligations to cleanup accumulated waste, does the environmental agency have the option under the statute giving rise to the obligation to remove the waste and seek reimbursement. *See*, *Mark IV Indus. v. N.M. Envtl. Dep't (In re Mark IV Indus.)*, 438 B.R. 460, 468 (Bankr. S.D.N.Y. 2010). Applying these factors to the instant case leads to the conclusion that an injunction to stop effluent from discharging into Long Branch Creek, and any clean-up directive relating to such injunction is not a claim.

Unlike the debtor in *Kovacs*, defendants are debtors-in-possession. Therefore, defendants have full access to their property and an ability to comply with any clean-up obligation imposed by an injunction. Further, if the allegations of ongoing pollution into Long Branch Creek prove an accurate assessment, no court can condone or permit active pollution. Any action or inaction resulting in the release of a pollutant must stop. These first two considerations are straight-forward. It is the third consideration, whether a governmental agency would have an optional right of repayment, which is generally more challenging because it requires the court to look closely at the underlying environmental statutes. Here, the environmental statutes at issue are the CWA and RCRA. Beginning with the latter, courts have affirmatively found RCRA does not authorize a right of payment.

"[T]he Resource Conservation and Recovery Act, which is the basis of the government's equitable claim, does not entitle a plaintiff to demand, in lieu of action by the defendant that may include the hiring of another firm to perform a clean up ordered by the court, payment of clean-up costs. It does not authorize any form of monetary relief." *Apex Oil Co.*, 579 F.3d 734 at 737 (7 Cir. 2009). If a governmental unit cannot recover clean-up costs, it follows participants of a citizen suit would be equally barred from monetary relief. *Id.*

> It is apparent from the two remedies described in § 6972(a) that RCRA's citizen suit provision is not directed at providing compensation for past cleanup efforts. Under a plain reading of this remedial scheme, a private citizen suing under § 6972(a)(1)(B) could seek a mandatory injunction, i.e., one that orders a responsible party to "take action" by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, i.e., one that "restrains" a responsible party from further

15

violating RCRA. Neither remedy, however, . . . contemplates the award of past cleanup costs, whether these are denominated "damages" or "equitable restitution."

*Meghrig v. KFC W.,* 516 U.S. 479, 485, 116 S. Ct. 1251, 134 L. Ed. 2d 121(1996). Here, plaintiffs' citizen suit seeks declaratory and injunctive relief under RCRA based upon the alleged discharge of effluent into Long Branch Creek near defendants' hog farm. It is well established RCRA does not allow recoupment of clean-up costs. Therefore, any injunctive relief awarded in favor of the plaintiffs requiring defendants to comply with RCRA does not include a right to payment and is not a claim in defendants' bankruptcy case.

This court has not found similar case law regarding the CWA. However, after examining the statutory framework of the CWA, it is similar to RCRA. It follows, therefore, that like RCRA the CWA does not allow plaintiffs in a citizen suit to recover clean-up costs and any injunctive order requiring compliance with the CWA is not a claim under the Bankruptcy Code. Citizen suits are authorized under 33 U.S.C. § 1365. A citizen is allowed to bring a civil suit against any person alleged to be in violation of effluent limitations. 33 U.S.C. § 1365(a)(1). The district courts have jurisdiction [over citizen suits], "without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be . . . ." 33 U.S.C. § 1365(a)(2). The enforcement provisions of the CWA authorize the administrator "to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order under subsection (a) of this section . . . and such court shall have jurisdiction to restrain such violation and to require compliance." 33 U.S.C. § 1319(b). This is the same form of enforcement language the Supreme Court found did not constitute a monetary

award of clean-up costs under RCRA. *See*, *Meghrig v. KFC W.*, 516 U.S. 479, 485, 116 S. Ct. 1251, 134 L. Ed. 2d 121 (1996). Thus, assuming the district court finds defendants are in violation of the CWA, the only recovery to which plaintiffs are entitled is a pure injunctive remedy. Plaintiffs have no option to accept money in lieu of stopping the act or omission that violates the CWA. The absence of a right to payment leads to the conclusion that the injunctive relief sought in the Lawsuit regarding alleged violations of the CWA is not a claim under the Bankruptcy Code. By extension, without a claim there can be no liability on a claim, or debt to be discharged. 11 U.S.C. § 101(12).

It is important to reiterate this court was not asked to determine whether defendants are in violation of the CWA or RCRA. It is also important to note that neither the court's Order Regarding Cross Motions for Summary Judgment, nor this supplemental opinion reach the issue of whether the costs, fines, penalties, and attorneys' fees requested in the Lawsuit are "debts." This court was only asked to determine the very limited issue of whether the declaratory and injunctive relief plaintiffs' seek in the Lawsuit were debts, which it finds they are not.

## CONCLUSION

Based on the foregoing, plaintiffs' motion for summary judgment is **ALLOWED** as specifically plead and defendants' motion for summary judgment is **DENIED**. The court recalls plaintiffs previously sought relief from the automatic stay in the underlying bankruptcy. On October 8, 2015, the court entered an Order Setting Deadlines, which ordered the automatic stay would remain in effect pending further order of this court. The court does not find this order allowing plaintiffs' motion for summary judgment to alter the Order Setting Deadlines. However, inasmuch as the determination of summary judgment in this Adversary Proceeding on the limited basis of what constitutes a claim may change the parties' positions regarding relief from the automatic stay, the

court will entertain a request fro the rescheduling of plaintiffs' motion for relief from the stay.

**END OF DOCUMENT**